## Case No. 11,350.

Ex parte POULSON.

[15 Haz. Reg. Pa. (1835) 380.]

Circuit Court, E. D. Pennsylvania. 1835.

CONTEMPT OF COURT — POWER OF COURTS TO PUNISH—PUBLICATIONS CONCERNING TRIALS.

[The act of March 7, 1831 (4 Stat. 487), limiting the power of the federal courts to punish in cases of contempt, took away the jurisdiction of the court to proceed for contempt against one publishing in a newspaper an article tending to prejudice or affect the rights of parties to a suit on trial in such court.]

Motion for a rule on Zachariah Poulson, Esq., editor of the American Daily Advertiser, to show cause why an attachment should not issue against him for a contempt of court in publishing the following article in his paper of the 12th ult.:

"Drew, the Counterfeiter.—This notorious fellow, who was arrested some time since at Philadelphia, and lightened of about six thousand dollars of good money, has recently had the effrontery to bring a suit against the mayor of that city to recover this amount of property. We believe that the Drews, father and son, were both arrested, but that the latter was liberated upon turning state's evidence, and that he has since turned upon his heels and made off. Another person, who was to have given testimony against Drew, has denied his belief in a future state of being, and thus become incapacitated for testifying. The elder Drew, thus seeing a clear field before him, set about recovering the $6,000, and has brought on witnesses to prove that he was a man of wealth, and that it was no uncommon

thing for him to have such an amount of property! The city solicitor of Philadelphia, Mr. Olmstead, came down in the last boat, and the mayor of this city, Mr. Gilman, together with several of our old inhabitants, have gone on to Philadelphia to give in their testimony concerning the Drews, who, we believe, originated in these parts.—Bangor Whig."

BALDWIN, Circuit Justice (delivering the opinion of the court). The following are the circumstances under which this motion is made: This action was brought to the last October term of this court, and, being regularly at issue, was ordered for trial on the 11th inst., when a jury was sworn, and the trial proceeded. It was resumed on the 12th, when Mr. Ingersoll, counsel for the plaintiff, stated that he had a motion to submit to the court in relation to a publication which had appeared in Poulson's American Daily Advertiser of that morning. Hugh Grimes, being sworn, deposed that he had purchased at the office of Mr. Poulson a paper, produced and identified, containing the offensive publication, taken from a newspaper published at Bangor, in the state of Maine.

From the evidence given on the trial of the cause thus far it is clear that the publication refers directly to the plaintiff, and the cause of action which he has submitted to the court and jury, and in a manner calculated to produce the worst effect upon the administration of justice, as well by the character of the paper in which it appears as the nature of the remarks upon the plaintiff, his cause now trying, and the witnesses who appear in his behalf.

In the present stage of the cause, it would be improper for the court to express any opinion as to the truth or falsehood of the matter contained in the publication. That must be reserved till all the evidence is heard and commented on by counsel, when it will be ascertained what are the facts of the case. These considerations can have no bearing upon the present application against a person who is no party to the suit, and cannot be the subject of comment without running the risk of prejudging the rights of the contending parties. It is, however, not only a duty to them, but to the public, to express the strongest disapprobation of any outdoor interference with the administration of justice. Be it in whatever mode it may, it cannot fail to embarrass or obstruct if not defeat, the regular course of judicial proceedings.

The supreme law of the land has secured to every man a right of appealing to the law for the redress of an injury of which he complains; has appointed tribunals to hear and determine upon their justice, and prescribe the modes of proceeding according to established rules of evidence and principles of law. The laws will have been enacted in vain, courts of justice will become useless, and suitors be deprived of the benefits of resorting to them for redress, if it shall be their common fate to be obliged to encounter the effect of publications of a description now before us on the merits of their cause. It is headed. "Drew. the Counterfeiter." "This notorious fellow" "has had the effrontery to bring a suit," &c., and the language of the article is of a consistent character throughout. It cannot be too much reprobated, or the evil example too much feared, when it is suffered to appear in a paper highly respectable, conducted by a most estimable member of society. Nor can any friend to the due administration of the law and justice to the suitors in its courts look on the prevalence of such a practice without the deepest regret. Every good citizen should make the case his own, by supposing himself a plaintiff in a suit on trial by a jury, many. if not all, of whom have read a similar allusion to himself and case. He could appreciate the consequences, and decide whether it was such an interference with the cause of justice as to require the interposition of the law for its prevention and punishment. What has been the fate of Mr. Drew may be the fate of all other suitors. Causes on trial in court may be simultaneously tried in the public papers; the one conducted by established rules, evidence received only on oath, and the law applied by a responsible tribunal, the jury bound to listen in court only to the evidence. the counsel, and the law; but out of court, at liberty to hear and read statements, respecting the case, made without regard to either. It would be but one short step more to take, and the jury would be tampered with at pleasure when not in the box, and be liable to be assailed by any person who might please to attempt to benefit or prejudice a suitor. The moral offence, or the pernicious effects, would be but little aggravated if done in open court, or when the jury are deliberating on their verdict. Let it be done there, or in the public papers, it is a violation of the legal and constitutional rights of those who appeal to the law for redress.

From its nature, it is necessary that the means of prevention should be prompt and summary, or the mischief will become consummated by delaying a remedy which must be sought in the usual forms of law. That which is now asked is of this description, and the injury complained of is the most aggravated kind, though the cause of the re-publication be inadvertence or the unconsciousness of its impropriety. That is no matter of consideration in the present stage of this motion. The first inquiry is into the jurisdiction of this court to issue an attachment for contempt for a publication relating to a suit on trial, or in any way pending before it. On March 2, 1831 [4 Stat. 487], congress passed "An act declaratory of the law concerning contempt of court." the first section

of which enacts: "That the power of the several courts of the United States, to issue attachments, and inflict summary punishment, for contempt of court, shall not be construed to extend to any cases except misbehaviour of any person or persons in the presence of the said courts, or so near thereto as to obstruct the administration of justice, the misbehaviour of any of the officers of the said courts in their official transactions, and the disobedience or resistance by any officer of the said courts, party, juror, witness, or any other person or persons, to any lawful writ, process, order, rule, decree, or command of the said courts." Pamph. Laws 1831, c. 99. The history of this act, the time of its passage, its title and provisions must be considered together, in order to ascertain its meaning and true construction. It was enacted shortly after the acquittal of Judge Peck, of Missouri, on an impeachment preferred against him for issuing an attachment against a member of the bar for making a publication in relation to a suit which had been decided by that judge. On the trial the law of contempt was elaborately examined by the learned managers of the house of representatives and the counsel for the judge. It was not controverted that all courts had power to attach any person who should make a publication concerning a cause during its pendency, and all admitted its illegality when done while the cause was actually on trial. It had too often been exercised to entertain the slightest doubt that the courts had power, both by the common law and the express terms of the judiciary act, § 17 [1 Stat. 83], as declared by the supreme court, to protect their suitors by the process of attachment.

With this distinct knowledge and recognition of the existing law, it cannot be doubted, that the whole subject was within the view of the legislature; nor that they acted most advisedly on the law of contempt, intending to define in what cases the summary power of the courts should be exercised, and to confine it to the specified cases. From the title and phraseology of the act it would seem to have been their intention to declare that it never existed in any other cases than those enumerated. It is "a declaratory act," which is a declaration of what the law "was, is, and shall be hereafter taken" when put into the form usual in statutes, which operate to settle the law retrospectively. These words are not in this law, but there is an expression which is tantamount,—"the power of the several courts, &c., shall not be construed to extend," &c.,—which refers to the past, the present, and the future, as a proviso or limitation to powers of the courts, from whatever source derived, repudiating their summary action as effectually as if they had never been authorized. As this is an inferior court within the provision of the constitution, it is created by the laws, with such powers only as congress has deemed it proper to confer, among which is this: "And

to punish by fine or imprisonment, at the discretion of said courts, all contempts of authority in any cause, or hearing before the same." Act 1789 (1 [Story's Laws] 63; [1 Stat. 88.]) The acts of 1831, must be taken to be the declared construction of this and all other laws limiting its operation in the manner prescribed, and, as generally considered, congress is to this court what the constitution is to the supreme court. Their acts must be construed on the same principles, and operate as constitutional amendments, which is to give such construction to the original act as if the jurisdiction had never been given.

The third article of the constitution extends the judicial power to controversies between a state and citizens of other states, a state and foreign states, citizens or subjects. Suits of this description were brought and sustained till the adoption of the eleventh amendment, which declared, that "the judicial powers of the United States shall not be construed to extend" to such cases. This was held by the supreme court to have a retrospective effect, annulling all jurisdiction over such cases past, present, and future. [Bingham v. Cabot] 3 Dall. [3 U. S.] 382; [Cohens v. Virginia] 6 Wheat. [19 U. S.] 405, 408; [Osborn v. Bank of U. S.] 9 Wheat. [22 U. S.] 850, 858. The same effect must be given to this act, so as to make it what it evidently intended to be, a prohibition of the exercise of summary jurisdiction over contempts, excepting only such cases as are defined. In its prospective operation its terms are peremptory, admitting of no construction which can bring the present application within the exception without doing violence to its plain meaning.

There can be no doubt of the constitutional power of congress to act upon this subject, as far as respects our courts. It is no invasion of the rights of a suitor to bring or defend a suit, or in any way affect its legal remedy, in the ordinary course of justice. It is in the discretion of the legislative power to confer upon courts a summary jurisdiction to protect their suitors or itself by summary process, or to deny it. It has been thought proper to do the latter, in language too plain to doubt of the meaning of the law, or, if it could be doubted by any ordinary rule of construction, the occasion and circumstances of its enactment would most effectually remove them. It would ill become any court of the United States to make a struggle to retain any summary power, the exercise of which is manifestly contrary to the declared will of the legislative power. It is not like a case where the right of property or personal liberty is intended to be affected by a law, which the court would construe very strictly to save a right granted or secured by any former law. Neither is it proper to arraign the wisdom or justice of a law to which a court is bound to submit, nor to make an effort to move in relation to a matter

when there is an insuperable bar to any efficient action.

The law prohibits the issuing of an attachment, except in certain cases, of which the present is not one. It would therefore be not only utterly useless, but place the court in a position beneath contempt, to grant a rule to show cause why an attachment should not issue, when an exhibition of the act of 1831 would show most conclusive cause. The court is disarmed in relation to the press; it can neither protect itself, or its suitors; libels may be published upon either without stint; the merits of a cause depending for trial or judgment may be discussed at pleasure; anything may be said to jurors through the press, the most wilful misrepresentations made of judicial proceedings, and any improper mode of influencing the decisions of causes by out of door influence practiced with impunity. The second section of the same law provided "That if any person or persons shall corruptly, or by threats, or force, endeavor to influence, intimidate or impede any juror, witness or officer in any court of the United States, in the discharge of his duty, or shall corruptly, or by threat, or force, obstruct or impede, or endeavor to obstruct or impede, the due administration of justice therein, every person or persons so offending shall be liable to prosecution therefor, by indictment," &c. This provision is in further confirmation of the view taken of the first section. It is a clear indication of the meaning of the law, that the misbehavior which may still be punished in a summary manner does not refer to those acts which subject a party to an indictment. To construe it otherwise would be to authorize accumulative punishment for the same offence. Taking the two sections in connection, the law admits of only one construction. The first alludes to that kind of misbehavior which is calculated to disturb the order of the court, such as noise, tumultuous or disorderly behavior, either in or so near to it as to prevent its proceeding in the orderly dispatch of its business; not to any attempt to influence, intimidate, or impede a juror, witness, or officer in the discharge of his duty in any other manner whatever. "The obstruction of the administration of justice," in the first section, refers to that kind of behavior which actually disturbs the court in the exercise of its functions while sitting; "the obstructing and impeding the administration of justice," or the endeavor to do so, in the second, refers to some act of corruption, to some force or threat, by which it is done or attempted to be done. The endeavor to influence, intimidate, or impede a witness, juror, or officer in the discharge of his duty is not punishable unless it is done corruptly, by force or threats. If done by any other manner, the law is silent; and, this being a penal section, its provisions must be confined to the special cases to which it extends. [U. S. v. Wiltberger] 5 Wheat. [18 U. S.] 94, 95.

With this limitation on the summary jurisdiction of the court, and the want of any legal provision making it cognizable by indictment, we cannot say that the publication which is the ground of this motion, or any other, is or can be any disturbance of the business of the court. The action of the press is noiseless, producing the same effects, far or near, it matters not. The business of the court is not interrupted. Judges and jurors can perform their functions on the bench and in the box by confining their attention to the law and evidence. Disorder may be repressed in their presence or hearing in a summary manner, but after an adjournment no attachment can be issued for anything done out of court, during the intermission of its actual session. Nor can any publication, which holds out no corrupt motive to influence a juror, witness, or officer, or uses any threats to influence, intimidate, or impede him in his duty, be the subject of an indictment, consistently with this law. The press is free, if not set to work in the presence of the court, or so near as to interrupt its business. The law does not prohibit any endeavor made to influence or intimidate a juror or witness, if corruption, force, or threats are avoided. Papers may be put into their pockets, conversation held with them, newspapers put into their hands, or statements made in relation to any matter in issue while they are actually impanelled. The court may regret and censure the practice, and perhaps admonish the party who thus tampers with a juror or witness, but can neither punish the offence or prevent its repetition. The law has tied their hands. The judges must be passive. It is not for them to be the first to set the example of disobedience to the law, or attempt to evade plain enactments; most especially not by the exercise of a forbidden jurisdiction. These are all the powers with which congress have entrusted the courts of the United States, in insuring the fair administration of the laws, protecting themselves, jurors, witnesses, and officers from any improper interference with their respective duties, either by attachment or indictment.

For the protection of parties, for their security of a fair and impartial trial and decision of their case on the evidence and law which apply to it; to defend them against the efforts of the press or of individuals to excite a prejudice in the minds of a jury, to induce them to find a verdict on out of door statements, or other means of perverting their judgments,—no legal check is interposed. It is left to the discretion of the conductors of public journals, and all others, to take whatever course their sense of public justice requires; to decide what is proper for jurors to hear and see, as guides to their verdict, whether it is the truth or false, the effects of malice, prejudice, or from any excusable motive. Before the passage of the act of 1831 there was an acknowledged power resting in the sound, legal discretion of the court to be exercised with caution, and from its nature attended

with the highest responsibility of the judges, which did authorize them, by the process of attachment, to prevent and punish the publication of articles like the one before us; and in this case it would have been the imperious duty of this court to have brought their powers into action by granting this rule, if the legislative power had not taken it away. How far it would have been proper to exercise them would have depended on the cause shown. On the rule, it was a clear, prima facie case for some interference. But as congress has deemed such a power too dangerous to be entrusted to the discretion of judges on a motion, or of a court and jury on an indictment, and have not thought it expedient to give a remedy to a party who has been injured by a publication by authorizing him to bring a suit against the publisher for damages, we have no cognizance of the matter. The means of redress which had before existed have been taken away without the substitution of any other. The law has left the propriety of such publications to the discretion of the editors of public papers, after long experience of the effects of leaving it to the discretion of courts, who assumed high responsibilities in its exercise; while none is imposed on those in whose breasts it now rests. It is the duty of the court to give the law its full operation. It has been enacted deliberately, with full knowledge not only of the course of the common law, the act of 1789, but of the statute law of Pennsylvania on the same subject, passed in 1809, which gives the injured party a double remedy for any injury complained of in a case like this. After taking from the courts of the state the power to punish for contempt, except in certain cases, the law declares that no publications out of court, concerning any cause depending therein, shall be construed into a contempt, &c., "but, if such publication shall improperly tend to bias the minds of the public, the court, the officers, jurors, witnesses, or any of them, on a question pending before the court, every person feeling himself aggrieved by such publication shall be at liberty either to proceed by indictment, or to bring an action at law against the author, printer, publisher, or either of them, and recover thereupon such damages as a jury may think fit to award." 5 Smith, Laws, p. 55.

Thus it appears that, while suitors in the state courts can be protected against publications like this, they are without protection in the federal courts. The legislature of the state deem it both an indictable and an actionable offence. The legislature of the Union deem it neither a contempt of the law, of the court, an offence to the public, or an injury to a party. The rule must be refused, but it is hoped that an appeal to the sense of justice, the magnanimity of the press to abstain from any publication which shall improperly tend to bias the minds of the public, the court, the officers, jurors, or witnesses in any cause while actually under trial before a jury in this court, may not be in vain. Its

conductors should remember that suitors stand unarmed and defenseless before them; that the hands of the court are manackled; that the law of 1831 has placed no arbiter between an editor and a party to a trial, whose life, character, liberty, or property may be put in jeopardy by the influence of the press. The law has taken from him a shield, and from the court the sword. Both must be submissive under the inflictions of the press, be they just or unjust. If it is conducted in the spirit of chivalry, and must be employed on cases depending in the courts, let it be on suitors in state courts, who can meet them in the panoply of the law; not on those who are helpless in this. It is neither manly or generous to assail those who can make no resistance, or inflict an injury for which the sufferer is left without a remedy.